# EXHIBIT B

IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

COBB COUNTY GA.
FILED IN OFFICE

'19 SEP 27 AM 11: 19

*Rebecca Keaton*

COBB SUPERIOR COURT CLERK

JEAN DEVERZE,

        Plaintiff,

    v.

UBER TECHNOLOGIES, INC.,
RAISER, LLC, RAISER-CA, LLC,
and TRAVIS KALANICK,

        Defendants,

Case No.: *19-1- 7123*

## COMPLAINT
### (Jury Trial Demanded)

Plaintiff complains of Defendants and alleges as follows:

## PARTIES

1.    Plaintiff is a driver for the ridesharing service operated by Defendant Uber

Technologies, Incorporated and its subsidiaries Raiser, LLC and Raiser-CA. LLC,

(hereinafter collectively referred to as "Uber" or "Defendant"). Uber is a

corporation organized and existing under the laws of Delaware, with its principal

place of business at 1455 Market Street, San Francisco, California. Uber, upon

information and belief, is a holding company for Raiser, LLC and Raiser-CA,

LLC. Defendant Travis Kalanick was at all relevant times, the Chief Executive

Officer of Uber Technologies.

1

## JURISDICTION

2. . This Court has jurisdiction of the parties and subject. Plaintiff is a resident of Cobb County Georgia and the performance of the contract took place substantially in Cobb County and surrounding areas. Although Plaintiff's contract with Defendant contained an arbitration provision, Plaintiff chose to opt out of such provision and did so timely by letter to Defendants. Thus this Court has subject matter jurisdiction.

## A. Description of Uber's Business

3. Uber is the developer of a mobile phone application (hereinafter "App" or "Uber App") that provides on-demand car services to the general public. The App can also be accessed through an internet browser. Uber's on-demand limousine service, which is accessed through the App, is marketed under the name "UberBLACK." and also refers to its on-demand limousine service as "UberBLACK–The Original," as it was the first service ever offered by Uber.

4. Uber's App is essentially a personal dispatch service. The App is first downloaded onto a customer's mobile phone. Once downloaded, the App requests, among other things, the customer's debit or credit card information, which is held by Uber for future billing.

5. In order to request a ride, the customer must log into the App. The App then

locates the customer through the Global Positioning System ("GPS") software on the customer's mobile phone. The customer can either request a ride at his or her current location, or can manually set another location for pickup.

6.      After an Uber customer has agreed to the fare, he or she is then connected with an Uber driver who may choose to accept the trip. After the driver accepts the fare, he or she is provided the customer's name and location through the App.

7.      When the ride is completed, Uber automatically charges the customer's previously supplied credit or debit card. The customer does not directly pay the driver anything for the ride.

8.    Uber advises customers that gratuity is included in the fare and that there is no need to tip the driver, **even though gratuity is not included in the fare**. Uber requires drivers to decline tips if offered by the customer.

9.      After the customer is charged, at a rate dictated by Uber, Uber asks the customer to rate his or her driver using a five star system.

When demand for Uber's services reaches a certain level, Uber engages in "surge pricing." During the "surge period" customers are charged nearly ten times Uber's normal rate. Uber has total control over its surge pricing.

**B. How UberBLACK Drivers are Paid**

10.    At the end of each week, the driver receives an electronic earnings statement from Uber. The driver's total payout equals the "trip earnings" less "miscellaneous" expenses.

11.    Trip earnings equal the driver's fares less Uber's fee. Uber's fee is generally 25% of the trip earnings, and is taken off the top.    Defendants automatically deduct vehicle payments from their drivers' weekly earnings.    For reasons explained in greater detail below, Defendants impose requirements on their drivers that restrict their ability to obtain auto financing. As a result, drivers are forced to use lenders that partner with Defendants.

12.    These lenders charge the drivers subprime interest rates regardless of the driver's credit risk and Uber automatically deducts loan/car payments from their drivers' weekly earnings. Such payments are deducted from the driver's earnings regardless of whether the driver earned enough money to cover the expenses.

13.    After the vehicle payment deductions from a driver's pay, the driver must pay out of remaining funds operating expenses, including, but not limited to vehicle inspection sticker fees;  gas; vehicle maintenance;  mobile phone expenses and expenses related to purchasing and maintaining proper driver attire and collision and other supplemental insurance costs.

14.    The aforementioned expenses are incurred in the scope and course of Plaintiff's relationship as a driver in Defendants' business.

4

## C. UberBLACK Auto Financing

15.     Defendants required UberBlack drivers to deal with auto dealerships with which Uber had a preexisting relationship (the exact nature of which is not disclosed to the drivers).

·16.     Uber launched its operations in Philadelphia, Pennsylvania in June of 2012. At the time, Uber was only offering limousine services. Uber would later brand its limousine service as "UberBLACK."

17.     As demand increased, Defendants solicited new drivers in various ways. One means used by Uber by which Plaintiff was enticed into driving for Uber, was at a meeting scheduled and held by Uber's officer/owner Travis Kalanick.

18.     In or around August 2014, Mr. Kalanick came to a Marriot Hotel in Atlanta, Georgia to recruit drivers. At the meeting Kalanick represented to his audience of attendees (Plaintiff being among them) that they could make in excess of $90,000 a year but in order to make this amount of money a prospective driver would need to purchase a Black SUV.

19.     Kalanick also explained that the prospective driver will have to purchase a Chevy Suburban but only from one of his approved GM (General Motors) dealerships which must be financed by a lender with whom Kalanick and Uber also had a preexisting relationship) and they mandated exclusive use of such dealerships and lenders.

20.    The prospective driver could not use any other means of financing the SUV regardless of his/her credit qualifications. Kalanick required that one his lenders Santander Bank, be used to finance the purchase of the Chevy Suburbans used in the business and further required prospective drivers to purchase the Suburban from a Georgia dealership, Superior Chevrolet.

21.    Mr. Kalanick represented that his program requires the prospective driver to make a one-thousand dollar ($1000) down payment and be required thereafter to pay $400 to $500 per week to Santander Bank. Uber's preferred lender/partner for financing purposes.

22.    When asked by attendees how they would be able to afford such payments Kalanick stated that it would very easy to afford the payments based upon the amount of money that was expected to be earned by the drivers weekly. The attendees were not however provided with any information or projections to establish the accuracy of Kalanick's representations.

23.    After the meeting, and based upon the representations made by Kalanick, Plaintiff was induced to become a driver for Kalanick's Uber operation and made arrangements to purchase a new 2015 Chevy Suburban under the terms represented at the meeting and entered into a written contract with Defendant. Indeed hundreds of individuals were induced to sign on to the deal.

24.     However, within about  5 to 6 months of  signing up with Uber and purchasing the Chevy Suburban, Plaintiff's Suburban began experiencing numerous mechanical failures including air conditioning problems, braking problems, steering column problems, transmission problems and other problems. Indeed as it would turn out, the specific Suburban model Plaintiff purchased as required by Kalanick, was a defective model and was under recall for the very defects and problems Plaintiff had experienced with the Suburban. Much of Plaintiff's profits went into the constant repairs needed to be made by reason of this defective Suburban model SUV.

25.     Exacerbating the problem, Uber, within this same 5 to 6 month period after the August 2014 recruiting meeting alleged above, created a competing service called UberX  which it promoted to customers. The UberX service in material ways offered very similar services and more convenience for nearly half the fare price of UberBLACK service.

26.     UberX offered rider pick-up for as many as 6 customers who would be travelling in a similar direction for a set price. UberBLACK by contrast was limited to 4 such riders and any attempt by an UberBLACK driver to pickup more than the 4 rider limitation could result in his termination from the service.

27.     It appeared that Uber was deliberately and intentionally attempting to make the UberBLACK service a rarely used service and promote UberX instead and Plaintiff alleges that this was in fact the intention of Kalanick and Uber all along.

28.     UberBLACK drivers were receiving 80% of the fare charged to the customer where by contrast, UberX drivers received only 75% of the fare. By offering a greatly reduced fare through its UberX service and robust marketing of such fares while at the same time garnering an extra 5% of all such revenues by paying UberX drivers 5% less than UberBLACK drivers, Uber experienced a windfall of profits at the expense however of its UberBLACK drivers.

29.     At no time during the August 2014 recruitment meeting orchestrated by Kalanick, did Kalanick inform the attendees of his and/or his company's intention to add a cheaper service that would effectively force a 50% drop in fare prices which would trigger a 50% reduction in profit potential to UberBLACK driver.

30.     Plaintiff alleges that had he known prior to his decision to invest in a position as an UberBLACK driver, that the UberX service would be offered immediately on the heels of the UberBLACK service, he would not have made the substantial investments he made in the business.

**Uber's Bait and Switch Scheme**

31.     Kalanick 's true intention was to amass an army of Uber drivers all of whom would be driving higher-end luxury vehicles—an offering that the traditional taxi

industry could not compete with. Most of the traditional taxi cabs consisted of older vehicles that were lacking in the sort of luxury offerings that existed in Suburban SUV-type vehicles.

32.    The marketing strategy is that, given a choice, a potential ride-share customer would almost always prefer to use a faster, newer, cleaner and more comfortable service even if the costs were somewhat greater than the average taxicab service.

33.    To create this army of "Black" luxury cars ready for service, Kalanick and Uber planned and arranged a scheme whereby interested persons in the various cities Uber sought to operate in, would be induced into buying a luxury vehicle with company assistance facilitated by "partners" such as Santander and Superior.[1]

34.    The income potential as represented by Kalanick would have been accurate had Uber not introduced UberX and other cheaper services later offered, which reduced the profit potential for UberBLACK drivers and transferred such profits to

---

[1] For instance, it was reported by Reuters on July 23, 2015, in an article "Uber, Santander partnership on car loans is over" as follows:

> "Uber launched a program in November 2013 to link prospective drivers who do not have a car with manufacturers and lenders, **in the hopes it would boost the number of cars on the road for the app-based service.**
> The deal received widespread press attention at the time, and Uber said it hoped to finance 100,000 drivers."

See, https://www.reuters.com/article/us-uber-santandercons-deal-over/uber-santander-partnership-on-car-loans-is-over-idUSKCN0PX2CB20150723

9

Uber instead. Kalanick and Uber true objective was to induce purchases of luxury vehicles and other investments by the thousands by falsely representing and/or concealing their intention to reduce or convert UberBLACK drivers to UberX drivers. Kalanick could not launch any service without drivers and used corrupt means to create and develop this ready pool of drivers.

35.    Once Defendants had successfully established a pool of drivers, Defendants immediately established and pushed UberX because the UberX service would offer fares at nearly 50% less than the fare that would have been charged to the customer for UberBLACK services for the same trip.

36.    Additionally, while UberBLACK drivers would be paid at 80% of the total fare charged to customers, Defendants had planned to pay UberX drivers only 75% thus increasing Uber's take by 5%.

37.    Because of the cheaper UberX fares and Defendants' vigorous marketing of such fares and because Uber also kept more of the profit than it would have received as compared to UberBLACK's payout to drivers, Uber would receive a windfall of profits and had no incentive to continue marketing UberBLACK.

38.    All such efforts came at the expense of UberBLACK drivers because Uber effectively and indeed openly steered customers away from UberBLACK by making UberX the "default" service that appeared on its App. Thus any new

customer would likely never know of the UberBLACK service as same had been relegated to an obscure position in Uber's marketing strategy.

39.     Within a few months and after tens of thousands of Chevy Suburbans had been purchased by drivers through Defendants' schemes in various states and large cities around the country, Defendants suddenly terminated the financing arrangement with Santander and introduced UberX simultaneously.

40.     It was for the purpose of taking over the taxi transportation industry in many larger cities, that Uber introduced UberX and disadvantaged UberBLACK drivers by anticompetitive rates in UberX.

41.     Uber has purposefully and intentionally diverted business away from its UberBLACK drivers to gain a larger share of the ride-for-hire industry and did so at the expense of its UberBLACK drivers. Indeed since the launching of UberX, other cheaper service products were also offered and the latest such offer was promoted as "Uber Comfort". Regarding Uber Comfort, Uber asserts in its communication to its drivers that it is "*[d]esigned to compliment premium services such as Uber Black and Uber Black SUV—**not replace them**". See for example Uber Driver Communication at **EXHIBIT A**.).

42.     In attempting to convince its drivers that its new "Uber Comfort" offering was not intended to "replace" UberBLACK, Defendant had merely acted out of a

11

guilty conscience. Like all of its offerings since and including the launch of UberX, Uber had a specific intent and plan from the beginning to ultimately eliminate UberBLACK and/or to make it so unprofitable (from the driver's perspective) as to amount to eliminating it.

43.     Uber actively promoted and shifted its marketing towards UberX to the great financial harm of its UberBLACK drivers. Again, Uber had updated its App so that UberX would actually be the default selection literally leaving UberBLACK drivers with few if any means to obtain fares and thus to pay their expenses which included the Uber influenced and mandated financing costs of Chevy Suburbans.

44.     After having induced thousands of individuals such as Plaintiff into investing in UberBLACK based upon Uber's promises of income potential, **Uber would later advise UberBLACK drivers to become UberX drivers, even though UberX would represent nearly a 50% drop in income for UberBLACK drivers and 5% less gross profit.**

45.     Drivers who had invested in Uber had little choice but to continue and try to recoup some income to recover their investment and losses and availed themselves of whatever income they could make having already "bought in" to the deceptive opportunity advanced by Defendants. In fact it was Uber's plan from the beginning to induce drivers into purchasing luxury vehicles (actually to enhance its own

image) and did so through its false intentions and concealment of same from Plaintiff and others.

46.     Defendants in truth never had any intention to pay Plaintiff and others 80% gross profit of fares and never had any intention to maintain the fare rates at the level represented to Plaintiff and others. Defendants merely wanted to induce the purchase of thousands of luxury vehicles to launch its service and then implode the UberBLACK market through clandestine manipulation of its operations.

47.     Plaintiff's income (before expenses) as an UberBLACK driver dropped by approximately 50% within only 6 months after signing up with Uber and after Uber's launch of UberX and similar subsequent services.

### FIRST CLAIM
### Breach of Implied Covenant of Good faith and Fair Dealing

48.   Plaintiff incorporates all previous allegations as if set forth in full.

Every contract implies a covenant of good faith and fair dealing in the contract's performance and enforcement. *WirelessMD v. Healthcare.com Corp.*, 271 Ga. App. 461, 468, 610 S.E.2d 352 (2005*); Hunting Aircraft v. Peachtree City Airport Auth.*, 281 Ga.App. 450, 451, 636 S.E.2d 139 (2006).

49.     Although Plaintiff's contract did not contain a provision to the effect that Uber would not take action designed to reduce or otherwise prevent Plaintiff from earning the income and profits as were represented and contemplated and which were necessary to make the payments on the Suburban which Defendant required

Plaintiff to purchase and finance through its "partners", the same was implied under the circumstances and by operation of law.

50.   By immediately offering a competing service in UberX nearly simultaneously as Plaintiff was entering into a contract with Defendant and thereby making it virtually impossible for Plaintiff to earn the profits necessary to pay Santander Bank (let alone any of Plaintiff's other business expenses incurred as a driver) and by not disclosing such intentions to Plaintiff prior to or at the time of his entering into the various contracts at Defendant's at Kalanick's directions and urging, Defendants breached the implied duty of good faith and fair dealing.

51.    As a direct result of the breach, Plaintiff lost substantial profits and income and was unable even to pay the predatory and subprime interest payments for the Chevy Suburban he was required to purchase and finance. Plaintiff eventually was forced to return the Suburban to the dealership.

> Moreover, "[i]t is well settled that mere failure to perform a contract does not constitute a tort. **A plaintiff in a breach of contract case has a tort claim only where, in addition to breaching the contract, the defendant also breaches an independent duty imposed by law**.

*ServiceMaster Co., LP v. Martin*, 556 S.E.2d 517 (2001) 252 Ga. App. 751.

52.   As alleged herein, Defendant Uber acted knowingly and intentionally fully aware of the consequences such actions would have on Plaintiff.

53.   Besides lost profits, Plaintiff suffered and endured such anger, frustration, stress and worry as would ultimately cause him to suffer hypertension and develop such other related medical conditions for which needs constant medication.

Plaintiff is thus entitled to an award of punitive damages as a result of Defendants' conduct.

## CIVIL CONSPIRACY

54.   Plaintiff incorporates the allegations under the First Claim and further alleges that all Defendants conspired and agreed to commit at least two acts constituting a tort to wit: intentional breach of implied duty of good faith and fraud.

### Fraud in The Purchase and Finance Arrangement

55.   Defendants had knowledge that the particular Chevy Suburban which they had required drivers to purchase and finance, was a defective model that was under recall from the factory for serious defects.

56.   Defendants were thus aware that it could negotiate a substantial discount in price due to such defects and also because of the high volume of sales that an exclusive arrangement with dealers selling the defective vehicle would experience.

57.   Not only did Defendants obtain such substantial discounts for the defective Suburbans, it also arranged for kickbacks to them from Santander Bank from the

profits it received from the subprime interest rate loans imposed upon drivers for the defective Suburbans.

58.  Knowing that the defective Suburbans would soon malfunction and leave drivers such as Plaintiff with substantial and continual repair costs, Defendants had pre-planned to terminate the financing arrangement.

59.  Plaintiff further alleges that Defendants conspired and agreed to conceal its intentions to act in such a manner as to destroy the profit potential which UberBLACK drivers would be able to earn in order to induce them into purchasing the Suburbans and to invest other needed funds as a driver for Defendants.

60.  Defendants conspired and agreed to railroad Plaintiff and other drivers into accepting a program and profit structure wholly different and less profitable than the one discussed and contemplated at the time the agreements were consummated.

61.  The new programs and profit structure operated to substantially enrich Defendants at Plaintiff's expense and that such conduct as alleged herein is of a continuing and ongoing nature and has and continues to reduce and ultimately and effectively eliminate UberBLACK services altogether after Plaintiff has expended great expense in investing in his ability to offer such services.

62.  Plaintiff is entitled to recover his lost profits, and be compensated for his mental pain and anguish, fear and anger and frustration in facing his growing lack of ability earn a living. Defendants are also liable for all repairs for their part in

16

coercing or requiring Plaintiff to purchase of a defective automobile which they knew was defective at all relevant times.

63.     Plaintiff is entitled to punitive damages by reason of Defendants' knowing wrongful and fraudulent conduct.

## **BREACH OF CONTRACT AND CONVERSION**

64.     During the month of February 2016, Plaintiff had received a special request from two customers who had desired to reserve him as their preferred driver for various trips the customers had planned to make over the course of approximately two weeks. The total fares generated over this period was approximately $6300.

65.     However, Defendants failed and refused to pay Plaintiff at all for the fares accumulated by these customers. Although Uber asserted that it would investigate the matter and although it purported to be in the process of doing so over a period of at least a year, Defendants inexplicably refused to pay Plaintiff at all for the trips and have converted monies that belonged to him for their own use and benefit.

66.     During the period between around October 2016 to October 2017, Plaintiff made several demands that Defendants complete their investigation which had dragged on for months. After finally resolving that Plaintiff would not be paid on the earned fares, Plaintiff nevertheless demanded his money during October 2017

insisting   that Defendants release the funds rightfully owed him. Uber refused to comply with Plaintiff's demands.

67.   Plaintiff alleges further that Defendants' possession of the $3800 due him was unlawful as contrary to the contractual agreement and upon information and belief, disposed of the funds to suit its own needs and without rightful authority. Defendants have breached their obligation under the contract to pay Plaintiff for the trips and services performed and their acts further constitute conversion entitling Plaintiff to punitive damages.

**WHEREFORE,** Plaintiff demands judgment as follows:

1.  That he have and recover all damages resulting from Defendant's conduct including punitive damages;

2.  That he recover all costs incurred;

3.  That he have a trial by jury of all triable issues and any other or such further relief as may be just.

This _____ day of September, 2019.

By;_____

    Jean Deverze

18

## **VERIFICATION**

I, Jean Deverze, being first duly affirmed, do hereby depose and say:

I am the Plaintiff in the forgoing Complaint, I have read the allegations and the same are true to the best of my knowledge and belief.

This _____ day of September, 2019.

By:_____

Jean Deverze

Affirmed and subscribed to before me this _____ day of September, 2019.

By:_____

NOTARY PUBLIC                                    **S     E     A     L**

My Commission expires;_____

# EXHIBIT A



# An upgraded economy ride option

With Uber Comfort, you can make more money per Comfort trip than with UberX.

Designed to complement premium services such as Uber Black and Uber Black SUV—not replace them— Uber Comfort gives you a new way to make money.

Learn more

Elevate your ride and your fare

## Uber Blog

  



**Start riding with Uber**
**Install the app >**

✕

# What you can expect with Uber Comfort

- **Higher fares than UberX**
  - Eligible drivers with Uber Comfort can make more money per trip than with UberX. To see the rates for Uber Comfort in your city, just go to the Fares section of your partner dashboard.
    - New rates that go into effect on July 9 will be lower than pre-July 9 rates in the following pilot locations: Chicago, San Francisco, Honolulu, Salt Lake City, New Jersey, Memphis, and Wichita.

- **A more streamlined experience with Ride Preferences**
  - With Ride Preferences, your rider can request

Mail body: Fwd:

Sent from my iPhone

Begin forwarded message:

**From:** jean deverze <devjean@yahoo.com>
**Date:** September 26, 2019 at 6:47:11 PM EDT
**To:** devjean@yahoo.com



- Drive a vehicle with more legroom than smaller, compact cars eligible for UberX and that meet the minimum vehicle year requirement (see eligible vehicle list below)

# How to get access to Uber Comfort trip requests

their ideal temperature and let you know if they wish to chat, all before you arrive.

- **Extended pickup periods**



# Uber Comfort: built with more in mind

Introducing Uber Comfort, an elevated economy ride option for up to 4 passengers that's designed to help you make extra money by giving riders more room than they may get with UberX.

Driver Announcements

# Elevate your ride—and your fares— with Uber Comfort

July 6, 2019  /  Atlanta

    



| •ıl▎ Verizon   LTE | 6:13 AM | ⌁ ▭ |
|---|---|---|

Lyft Driver is Actively Using Your Location

**Driver Announcements**

# Elevate your ride–and your fares– with Uber Comfort

July 6, 2019  /  Atlanta

    



●ıl Verizon  LTE                6:13 AM                        ⬧ ▭
Lyft Driver is Actively Using Your Location

- **Extended pickup periods**
  - Except for airport pickups, riders using Uber Comfort will have 10 minutes before they can be charged for a driver-initiated cancellation fee.* Riders will pay higher per-minute wait time fees and higher cancellation fees on Uber Comfort than UberX when a driver needs to cancel.

# Eligibility criteria

Uber Comfort was designed to maximize possibilities on the Uber platform. Driver eligibility criteria for Uber Comfort include each of the following:

- Maintain eligibility on a different Uber option such as UberX, Select, UberXL, Uber Black, or Uber Black SUV

- Have a minimum star rating of 4.85 based on at least 250 trips

**.ıll** Verizon   LTE                 6:14 AM                         ◀ ▯

Lyft Driver is Actively Using Your Location

← Elevate your ride, and your fare

IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

COBB COUNTY. GA.
FILED IN OFFICE

19 SEP 27 AM II: I9

*Rebecca Keaton*
COBB SUPERIOR COURT CLERK

| | | |
|---|---|---|
| JEAN DEVERZE, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No.: 19-1-7723 |
| UBER TECHNOLOGIES, INC., | ) | |
| RAISER, LLC, RAISER-CA, LLC, | ) | |
| and TRAVIS KALANICK, | ) | |
| Defendants, | | |

## SUMMONS

TO THE ABOVE NAMED DEFENDANT:

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiffs attorney, whose name and address is:

Jean Deverze
427 Mirage Drive
Dallas, GA 30157

an answer to me complaint which is herewith served upon you. within 30 days after service of this summons upon you, exclusive of the day of service. II you fail to do so, judgment by default will be taken against you tor the relief demanded in the Complaint.

This _27_ day of _Sep_ 2019.

Rebecca Keaton
Clerk of Cobb County Superior Court

By: _____
        Deputy Clerk

To Defendant upon whom this Petition is served:

This copy of Complaint and Summons was served upon you this, _____ day of _____, 20____.

## General Civil and Domestic Relations Case Filing Information Form

Filed In Office Sep-27-2019 11:18:54
TRD-2019-01 32041-CV
Page 1

Rebecca Keaton
Clerk of Superior Court Cobb County

☒ Superior or ☐ State Court of COBB

| For Clerk Use Only | |
|---|---|
| Date Filed _____ | Case Number 19-1-7123 |
| MM-DD-YYYY | 23-49 |

**Plaintiff(s)**
DEVERZE    JEAN
Last        First          Middle I.    Suffix    Prefix

Last        First          Middle I.    Suffix    Prefix

Last        First          Middle I.    Suffix    Prefix

Last        First          Middle I.    Suffix    Prefix

Plaintiff's Attorney  Jean Deverze, Pro Se

Bar Number _____   Self-Represented ☒

**Defendant(s)**
UBER TECHNOLOGIES, INC
Last        First          Middle I.    Suffix    Prefix
RAISER, LLC
Last        First          Middle I.    Suffix    Prefix
RAISER-CA, LLC.
Last        First          Middle I.    Suffix    Prefix
KALANICK,    TRAVIS
Last        First          Middle I.    Suffix    Prefix

### Check One Case Type in One Box

**General Civil Cases**
☐ Automobile Tort
☐ Civil Appeal
☒ Contract
☐ Garnishment
☐ General Tort
☐ Habeas Corpus
☐ Injunction/Mandamus/Other Writ
☐ Landlord/Tenant
☐ Medical Malpractice Tort
☐ Product Liability Tort
☐ Real Property
☐ Restraining Petition
☐ Other General Civil

**Domestic Relations Cases**
☐ Adoption
☐ Dissolution/Divorce/Separate
   Maintenance
☐ Family Violence Petition
☐ Paternity/Legitimation
☐ Support – IV-D
☐ Support – Private (non-IV-D)
☐ Other Domestic Relations

**Post-Judgment – Check One Case Type**
☐ Contempt
☐ Non-payment of child support,
   medical support, or alimony
☐ Modification
☐ Other/Administrative

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_____        _____
Case Number            Case Number

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is an interpreter needed in this case? If so, provide the language(s) required. _____
                                                                Language(s) Required

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.
no

Version 1.1.18

Filed In Office Sep-27-2019 11:18:54
ID# 2019-0132042-CV
Page 1

*Rebecca Keaton*
Rebecca Keaton
Clerk of Superior Court Cobb County

DISCLOSURE STATEMENT
CLERK OF SUPERIOR COURT

CASE NUMBER  *19-1-7123-49*
Assigned by Clerk

*Jean DEVERZE*
PLAINTIFF

VS.

DEFENDANT
*UBER TECHNOLOGIES, INC*
*RAISER, LLC, RAISER-CA, LLC,*
*and TRAVIS KALANICK,*       TYPE OF ACTION

1. ____ Divorce without Agreement Attached
2. ____ Divorce with Agreement Attached
3. ____ Domestic Relations
4. ____ Damages arising out of Contract
5. ____ Damages arising out of Tort
6. ____ Condemnation
7. ____ Equity
8. ____ Zoning- County Ordinance violations (i.e. Injunctive relief-zoning)
9. ____ Zoning Appeals (denovo)
10. ____ Appeal, Including denovo appeal-excluding Zoning

11. ____ URESA
12. ____ Name Change
13. ____ Other
14. ____ Recusal
15. ____ Adoption

PREVIOUS RELATED CASES

Does this case involve substantially the same parties, or substantially the same subject matter, or substantially the same factual issues, as any other case filed in this court? (Whether pending simultaneously or not.)

✓ NO

____ YES – If yes please fill out the following:
1. Case # _____
2. Parties _____ vs. _____
3. Assigned Judge _____
4. Is this case still pending? _____ Yes _____ No
5. Brief description of similarities:

Attorney or Party Filling Suit

Form #0122
Revised 8/02/17

Filed in Office Sep-27-2019 11:27:28
ID# 2019-0132051-CV
Page 1

*Rebecca Keaton*
Rebecca Keaton
Clerk of Superior Court Cobb County

### IN THE SUPERIOR COURT OF COBB COUNTY

### STATE OF GEORGIA

Jean Deverze

CIVIL ACTION 19-1-7123-49

VS

Uber Technologies Inc

### ORDER RULE NISI

IT IS HEREBY ORDERED that each of the parties be and appear before the Honorable

Judge _____Kell_____ of the Superior Court of Cobb County, on the __4Th__

day of __November__, 20 19, at __9:30__ o'clock __AM__, at the Superior Court

Building, Marietta, Georgia in courtroom __7200__, to show cause, if any, why the prayers

of the within complaint should not be granted.

SO ORDERED, this __27__ day of __Sept.__, 20 19.

*Rebecca Keaton*

Clerk, Cobb County Superior Court

Presented by:

Attorney for __Plaintiff__

Prepared by: _____

 CT Corporation

**Service of Process Transmittal**
10/04/2019
CT Log Number 536374161

TO: Rose Barajas
UBER TECHNOLOGIES, INC.
1455 Market St Fl 4
San Francisco, CA 94103-1355

RE: **Process Served in Georgia**

FOR: Uber Technologies, Inc  (Cross Ref Name)  (Domestic State: DE)
UBER TECHNOLOGIES(GA), INC. (True Name)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | JEAN DEVERZE, Pltf. vs. UBER TECHNOLOGIES, INC., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Order, Exhibit(s) |
| **COURT/AGENCY:** | Cobb County Superior Court, GA<br>Case # 191712349 |
| **NATURE OF ACTION:** | Breach of Implied Covenant of Good faith and Fair Dealing and Fraud in The Purchase and Finance Arrangement |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Lawrenceville, GA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 10/04/2019 at 14:17 |
| **JURISDICTION SERVED :** | Georgia |
| **APPEARANCE OR ANSWER DUE:** | 11/04/2019 at 09:30 a.m. (Document(s) may contain additional answer dates) |
| **ATTORNEY(S) / SENDER(S):** | Jean Deverze<br>427 Mirage Drive<br>Dallas, GA 30157 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 10/04/2019, Expected Purge Date: 10/09/2019 |
| | Image SOP |
| | Email Notification,  Rose Barajas  rbarajas@uber.com |
| | Email Notification,  Dylan Tonti  tonti@uber.com |
| | Email Notification,  Allison Garrett  agarrett@uber.com |
| | Email Notification,  Rose Barajas  rbarajas@uber.com |
| **SIGNED:**<br>**ADDRESS:** | C T Corporation System<br>1999 Bryan Street<br>Suite 900<br>Dallas, TX 75201 |
| **For Questions:** | 866-665-5799<br>SouthTeam2@wolterskluwer.com |

Page 1 of  1 / SS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.